JOSEPH T. MCNALLY
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
CAROLYN S. SMALL (Cal. Bar No. 304938)
Assistant United States Attorneys
BENJAMIN S. KINGSLEY (Cal. Bar No. 314192)
Special Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-1259/2041
    Facsimile: (213) 894-0141
    E-mail:    alexander.schwab@usdoj.gov
                 carolyn.small@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 23-115-JLS |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT CARRIE L. TOLSTEDT |
| v. | Hearing Date: September 15, 2023 |
| CARRIE L. TOLSTEDT, | Hearing Time: 9:30 a.m. |
| Defendant. | Location: Courtroom of the Hon. Josephine L. Staton |

    Plaintiff United States of America, by and through its counsel of record, the Attorney for the United States Acting Under Authority Conferred by 28 U.S.C. § 515, Assistant United States Attorneys Alexander B. Schwab and Carolyn S. Small, and Special Attorney Benjamin S. Kingsley, hereby files its sentencing position for defendant Carrie L. Tolstedt.

    This sentencing position is based upon the attached memorandum of points and authorities; the files and records in this case,

including the Presentence Investigation Report (ECF 32 ("PSR")) and the plea agreement (ECF 7 ("Plea Agreement")); and such further evidence and argument as the Court may permit.

Dated: September 1, 2023           Respectfully submitted,

                                              JOSEPH T. MCNALLY
Attorney for the United States
Acting Under Authority Conferred by
28 U.S.C. § 515

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


            /s/
ALEXANDER B. SCHWAB
CAROLYN S. SMALL
Assistant United States Attorneys

BENJAMIN S. KINGSLEY
Special Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                            PAGE

TABLE OF AUTHORITIES....................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES ...................................1

I.   INTRODUCTION ......................................................1

II.  STATEMENT OF FACTS................................................2

III. SENTENCING GUIDELINES.............................................4

IV.  ARGUMENT .........................................................5

     A.   The Seriousness of the Offense ..............................5

     B.   Ensuring General Deterrence and Promoting Respect for
          the Law......................................................9

     C.   Defendant's Risk of Recidivism and Mitigating Factors ...12

V.   CONCLUSION ......................................................14

# TABLE OF AUTHORITIES

DESCRIPTION                                                              PAGE

**CASES**

Gall v. United States,
    552 U.S. 38 (2007) ............................................... 14

**SENTENCING GUIDELINES**

USSG § 2J1.2 ........................................................ 5

USSG § 3E1.1 ........................................................ 5

USSG § 4C1.1 ....................................................... 13

**STATUTES**

18 U.S.C. § 1517 .................................................... 1

18 U.S.C. § 3553 ............................................... passim

Sarbanes-Oxley Act of 2002, § 805(a), Pub. L. No. 107-204, 116
    Stat. 745 (2002) ................................................. 8

**OTHER AUTHORITIES**

"Penalties for White Collar Offenses: Hearing Before the
    Subcomm. on Crime and Drugs of the S. Comm. on the
    Judiciary," 107th Cong. 104 (2002) .............................. 10

148 Cong. Rec. S7350-04 (July 25, 2002) ............................. 8

Gary S. Becker, "Crime and Punishment: An Economic Approach," 76
    J. Pol. Econ. 169 (1968) ........................................ 10

S. Rep. No. 98-255 (1983) ............................... 7, 10, 11, 12

Stephanos Bibas, "White-Collar Plea Bargaining and Sentencing
    After Booker," 47 Wm. & Mary L. Rev. 721 (2005) ................ 11

U.S. Sentencing Commission, Amendments to the Sentencing
    Guidelines (Preliminary) (Apr. 5, 2023) ........................ 12

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Defendant was a high-level executive at Wells Fargo who, for years, ran what Wells Fargo called the "Community Bank" -- a banking division that covered essentially all retail banking commonly conducted at bank branches.  Defendant oversaw the Community Bank, including the sales goals for bank branch employees.  Many employees found these goals to be unrealistically high, and they began cheating to meet the goals.  The result is now a well-known scandal: Wells Fargo opened millions of often unused accounts as employees tried to game the system.

Eventually, reports of the scandal broke, prompting inquiries by the Office of the Comptroller of the Currency (the "OCC"), which regulates banks.  As head of the Community Bank, defendant was best equipped to assist the OCC in rooting out the problems at Wells Fargo.  Instead, she prepared a memo that she knew the bank would provide the OCC and corruptly withheld key information.  In particular, she withheld data on the number of employees who were terminated or resigned pending investigation for sales-related misconduct, and the fact that, of the many employees flagged by the bank's own metrics for potential sales-related misconduct, only a tiny percentage were investigated.

In connection with her efforts to mislead the OCC, and as part of a binding plea agreement, defendant pleaded guilty to obstruction of a bank examination, in violation of 18 U.S.C. § 1517.  Consistent with the Plea Agreement and PSR, the government agrees that the total offense level is 12, defendant is in criminal history category I, and the applicable Guidelines range is 10 to 16 months' imprisonment.

Consistent with the plea agreement, defendant should be sentenced to twelve-months' imprisonment to be followed by one year of supervised release. The United States Probation Office ("USPO"), by contrast, recommends a three-year term of probation. Such a sentence may reflect the fact that defendant poses no further danger to society, but it does not account for the other statutory sentencing factors. The sentence must reflect the seriousness of the crime: defendant attempted to conceal from regulators one of the biggest banking scandals in modern history. The sentence must afford adequate deterrence: corporate wrongdoers must be sent a clear message that maintaining a lucrative position through criminal behavior is not worth the risk. And the sentence must promote respect for the law: when top corporate executives commit crimes, they should not be able to avoid prison because they are not at risk of recidivism. A one-year custodial sentence strikes the right balance.

## II.  STATEMENT OF FACTS

For years, Wells Fargo's Community Bank was plagued by widespread employee misconduct. To meet onerous sales goals, thousands of Wells Fargo employees engaged in unlawful or unethical conduct. (PSR ¶ 14.) The misconduct varied widely. Some employees would use customers' personal information without consent to open accounts. Others would persuade customers to open accounts or other financial products that employees knew were of no or little value to the customer. (Id.) Employees would, for instance, open accounts for friends and family members or encourage customers to open duplicate checking or savings accounts or credit or debit cards.

(Id.)  Between 2002 and 2016, millions of secondary accounts and products were opened, many never used by customers.  (Id.)  Between 2011 and 2016, the Community Bank referred more than 23,000 employees for investigation into potential sales-related misconduct and terminated over 5,300 for customer-facing sales misconduct, including, in many cases, for falsifying bank records.  (Plea Agreement ¶ 10.)

Defendant was the head of the Community Bank for nearly a decade while this sales misconduct was occurring.  (PSR ¶ 13.)  She knew for years there was sales-related misconduct within the Community Bank and that employees were terminated each year for engaging in such misconduct.  (PSR ¶ 16.)  She also knew employee terminations were consistently increasing over time, that the misconduct was linked in part to the Community Bank's sales goals, and that the termination numbers likely underestimated the scope of the problem.  (Id.; Plea Agreement ¶ 10.)

In response to media coverage of the sales-related misconduct occurring at Wells Fargo, the Community Bank created the Sales and Service Conduct Oversight Team (the "Oversight Team") for, among other reasons, the purported purpose of proactively identifying sales misconduct.  (Plea Agreement ¶ 10.)  But the thresholds the Oversight Team set for identifying sales misconduct was such that only the most egregious conduct was flagged as potential misconduct warranting an investigation.  (Id.)  Indeed, as of July 2014, the thresholds established by the Oversight Team meant that the team investigated only the top .01 to .05 percent of employees engaging in activity considered a "red flag" for sales-related misconduct.  (Id.)

3

Eventually, the OCC -- the U.S. agency tasked with ensuring that banks operate in a safe and sound manner, among other things -- began examining the Community Bank.  But rather than aiding the OCC in its examination by providing it with all the relevant information, defendant obstructed the examination by seeking to minimize the scope of the misconduct.  (Plea Agreement ¶ 10.)  In particular, defendant prepared a memorandum she knew Wells Fargo would provide to the OCC.  (Id.)  In it, she corruptly withheld statistics on the number of employees who were terminated or resigned pending investigation for sales-related misconduct.  (Id.)  She also failed to disclose that the Oversight Team investigated an infinitesimal percentage of the employees whose behavior raised red flags for sales practices misconduct.  (Id.)

In connection with her obstruction of the OCC's examination of Wells Fargo and its sales-misconduct issues, defendant has pleaded guilty pursuant to a plea agreement to obstructing a bank examination in violation of 18 U.S.C. § 1517.  The parties entered into the plea agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  (Plea Agreement ¶ 2.)  The parties' agreed-upon sentence, set forth in paragraph 14 of the Plea Agreement, is that "an appropriate disposition of this case is that the Court impose a sentence no higher than 16 months' imprisonment; up to three years' supervised release with conditions to be fixed by the Court; a fine of $100,000; and a $100 special assessment."  (Plea Agreement ¶ 14.)

### III. SENTENCING GUIDELINES

The government agrees with the offense-level computation set forth in the PSR, which is consistent with the Plea Agreement.  (PSR

4

¶¶ 39-50; Plea Agreement ¶ 12.) In particular, the government agrees that the total offense level is 12 based on a base offense level of 14 under USSG § 2J1.2(a) and a two-level decrease for acceptance of responsibility under USSG § 3E1.1(a).

The government also agrees that defendant is in criminal history category I. An offense level of 12 and a criminal history category of I results in a Sentencing Guidelines range of 10 to 16 months' imprisonment.

**IV. ARGUMENT**

If the sole consideration at sentencing were whether a custodial sentence is necessary "to protect the public" from defendant's "further crimes," the government would be joining the USPO in recommending probation. 18 U.S.C. § 3553(a)(2)(C). Defendant is a retired bank executive subject to a lifetime ban from the industry; the government does not dispute that defendant poses no real risk of recidivism. But that is not the only sentencing factor at play. Not only must the sentence "reflect the seriousness of the offense," it must also "promote respect for the law" and "afford adequate deterrence." Id. § 3553(a)(2)(A), (B). The government stands by the plea agreement, including its agreement that an appropriate disposition is a sentence no higher than 16 months' imprisonment. But a probationary sentence is not appropriate. A custodial sentence of twelve months' imprisonment is.

**A. The Seriousness of the Offense**

Defendant attempted to hide from the OCC Wells Fargo's failure to police the widespread misconduct that occurred under her watch. And she did so as a highly compensated executive at one of the

5

world's largest financial institutions.  In a vacuum, submitting a misleading memo to regulators may not appear to be the most egregious offense.  But taken in context, it is a serious offense, one intended to cover up the scope of one of the most significant banking scandals of the century.

Large financial institutions like Wells Fargo are bedrocks of the American economy.  The OCC provides critical oversight and supervision to ensure that they comply with applicable laws and regulations to protect both customers and the economy as a whole.  Given the corporate structure and sprawling nature of a bank like Wells Fargo, the OCC's ability to do its job depends on high-ranking executives like defendant to be transparent and cooperative.  Corporations are notoriously difficult to investigate given their compartmentalization, size, and involvement of corporate counsel.  See U.S. Justice Dep't, Justice Manual § 9-28.700 (2023).  Absent the candor and good faith of corporate insiders, misconduct can be very difficult to uncover.

By the time the OCC got involved in this case, sales practices misconduct under defendant was already widespread.  As head of the Community Bank, defendant was uniquely positioned to enable the OCC to do its job.  She did the opposite.  Defendant minimized the scope of the misconduct, falsely characterizing it as the isolated misbehavior of a few bad apples.

In an effort to downplay the severity of defendant's conduct, her counsel pointed to the fact that lawyers were involved in defendant's preparation of the memorandum to the OCC that omitted critical information and that the "OCC had access to virtually any

internal Bank information it wanted, including . . . the information omitted from the memorandum." (PSR ¶ 33.)  Neither of these facts diminishes defendant's culpability.  As the leader of the Community Bank, defendant was both most familiar with the facts and responsible for conveying that information truthfully to lawyers.  And she admits that she intentionally omitted information in an effort to "minimize the scope of the sales practices misconduct issue." (Plea Agreement ¶ 10.)  The imprimatur of attorneys who had an incomplete picture is not a mitigating factor.  Nor does the OCC's access to internal bank documents render defendant's offense any less serious.  Regulators and other investigators should be able to rely on information that executives prepare and/or present to them without having to resort to combing through tens of millions of documents to ensure they are getting the full story.  If anything, the peripheral involvement of lawyers and the difficulty in reviewing innumerable records is simply a reminder of how insidious corporate wrongdoing often is.

Historically, Congress has been particularly concerned with the fact that "white collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses."  S. Rep. No. 98-255, at 77 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3260.  This is a common refrain over the course of decades.  In the 1980s, Congress sought to correct "historical patterns" for "white collar offenses for which plainly inadequate sentences have been imposed in the past."  Id. at 116.  In 2002, when debating the Sarbanes-Oxley Act, one senator discussed the need for "strong disciplinary action against executives who break the law" and argued that "executives who destroy the dreams of investors by irresponsible and unethical

behavior will be given the severe punishment they deserve." 148 Cong. Rec. S7350-04, S7355 (July 25, 2002) (statement of Sen. Mike Enzi) (mentioning). Part of Sarbanes-Oxley even directed the Sentencing Commission to enhance "fraud and obstruction of justice sentences" to ensure that the sentencing guidelines for "obstruction of justice are sufficient to deter and punish that activity." Sarbanes-Oxley Act of 2002, § 805(a), Pub. L. No. 107-204, 116 Stat. 745 (2002). In light of this legislative history, it is clear that Congress viewed non-custodial sentences as inadequate in cases like this one involving obstruction.

Nor is this a case where defendant's dishonesty had no real-world consequence. It mattered. The Los Angeles Times was reporting on sales misconduct at Wells Fargo by the fall of 2013 (PSR ¶ 17), but the scandal was not fully brought to light until several years later in September 2016, when several settlements made public the full scope of the sales practices misconduct within the Community Bank. Aside from the settlements themselves, which included a $3 billion payment as part of its deferred prosecution agreement with the government (PSR ¶ 9 n.1.), Wells Fargo had to deal with the public fallout among politicians and investors. Had defendant been diligent in investigating the misconduct and forthright with regulators, the result for Wells Fargo and its shareholders may have been less severe.

**B.     Ensuring General Deterrence and Promoting Respect for the Law**

Defendant's crime must also be met with a sentence sufficient to offer general deterrence and promote respect for the law.  Defendant had strong economic incentives to protect her job by concealing the wrongdoing that occurred on her watch.  As the PSR makes clear, defendant was highly compensated.  Upon retirement, she left Wells Fargo with roughly $125 million in stock, options, and restricted shares, though more than half of that money was subsequently clawed back.  (PSR ¶¶ 19, 36.)  This figure does not include the millions of dollars in cash compensation defendant was paid each year as head of the Community Bank.  (PSR ¶ 104.)  Faced with an OCC investigation into the sales misconduct scandal, defendant prioritized keeping her lucrative position over candor and transparency.  It is understandable that executives want to do what it takes to keep their jobs and protect their reputations.  But the penalty for this type of criminal conduct must be sufficient to overcome that impulse even when the stakes are high.

Many corporate executives, like defendant, who are compensated millions of dollars a year may be tempted to deceive regulators or skirt the truth with their boards of directors in an effort to keep their high-paying jobs -- whether to cover up deficiencies in their own performance or to hide malfeasance that occurred on their watch.  If probation is viewed as the likely outcome, executives may decide that obstructing an investigation is worth the risk if it means potentially maintaining their lucrative roles.  In fact, in drafting § 3553, Congress was in part addressing the concern that "[m]ajor

white collar criminals often are sentenced to . . . little or no imprisonment," which the offenders disregard as "a cost of doing business."  S. Rep. No. 98-255 at 76, 1984 U.S.C.C.A.N. at 3259.  A prison sentence best serves the goal of general deterrence.  <u>See</u> "Penalties for White Collar Offenses: Hearing Before the Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary," 107th Cong. 104 (2002) (statement of James B. Comey, Jr., United States Attorney for the Southern District of New York) ("We begin with the principle that the certainty of real and significant punishment best serves the purposes of deterring white collar criminals . . . . [I]f it is unmistakable that the automatic consequence for one committing a significant white collar offense is prison, then many will be deterred.").

Nor is deterring corporate crime simply a matter of counteracting the massive financial rewards corporate wrongdoers seek.  For a punishment to afford adequate deterrence, it must account not only for those incentives, but also the likelihood a defendant will be caught.  <u>See, e.g.</u>, Gary S. Becker, "Crime and Punishment: An Economic Approach," 76 J. Pol. Econ. 169, 184 (1968).  Given the difficulty in uncovering corporate wrongdoing, particularly given the layers of insulation enjoyed by the upper echelons of a major publicly traded company, the need for a guideline sentence is all the greater.  A custodial sentence ensures the expected value of the prospective punishment outweighs the lucrative payoffs future wrongdoers would hope to obtain even when discounted by the odds of being caught.

Public trust in the criminal justice system requires that corporate executives face appropriate consequences for their actions. The perception that white-collar criminals, particularly well-paid, well-educated executives like defendant, often get no more than a "slap on the wrist" is corrosive to the system's legitimacy.  A twelve-month term of imprisonment in this case would promote respect for the law.  Such a sentence would send the message that highly compensated corporate executives -- particularly those, like defendant, who are responsible for overseeing and operating a federally insured bank -- are held accountable for their actions as much as any other member of society.  Again, in enacting § 3553(a), Congress was worried that "a category of major white collar criminals too frequently was sentenced to probation or too short a term of imprisonment because judges using the old rehabilitation theory of sentencing, did not believe such offenders needed to be rehabilitated and, therefore, saw no need for incarceration." S. Rep. No. 98-255, at 177, 1984 U.S.C.C.A.N. at 3360.  As Third Circuit Judge Stephanos Bibas has reflected, "Although economists may focus on ex ante deterrence, judges may prefer to look ex post at the sympathetic, white, educated offender who reminds judges of themselves and seems to pose no danger."  Stephanos Bibas, "White-Collar Plea Bargaining and Sentencing After Booker," 47 Wm. & Mary L. Rev. 721, 724 (2005). "Allowing these offenders to escape imprisonment, however, is inequitable and undercuts the law's deterrent and moral message condemning white-collar crime."  Id.

Finally, while the disclosed recommendation letter correctly evaluates defendant's risk of recidivism and need for rehabilitation,

11

it misapplies some of the remaining sentencing factors.  In particular, the letter references defendant's respect for the law and the need to deter her future crimes.  (CR 31, at 3, 5.)  But neither of these factors are solely or even principally concerned with the individual defendant.  Indeed, as Congress explained in connection with § 3553(a), "to deter <u>others</u> from committing the offense . . . is particularly important in the area of white collar crime."  S. Rep. No. 98-255 at 76, 1984 U.S.C.C.A.N. at 3259 (emphasis added).  When considering all the sentencing factors together, a non-custodial sentence is simply inappropriate.

     **C.   Defendant's Risk of Recidivism and Mitigating Factors**

As stated earlier, there is no dispute that defendant poses a minimal risk of recidivism, and a lengthy prison sentence is not necessary to protect society.  The Sentencing Commission has recently proposed amending the Sentencing Guidelines to reduce the guideline sentences for "zero-point offenders," i.e., defendants who did not receive any criminal history points and meet various other criteria. U.S. Sentencing Commission, Amendments to the Sentencing Guidelines (Preliminary) (Apr. 5, 2023), § 4C1.1(a), <u>available at</u> <u>https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf</u>.  In proposing this amendment, the Commission was explicit in its reasoning: "offenders with zero criminal history points . . . have considerably lower recidivism rates than other offenders."  <u>Id.</u> Although this guideline is not expected to be in effect by the time of defendant's sentencing -- and, in any event, the parties agreed in the binding Plea Agreement not to argue that any other departures be

imposed beyond what is already in the Plea Agreement -- the Court can consider this factor under § 3553(a).  If the proposed amendment were applicable, defendant's guideline range would be six to twelve months' imprisonment.  The government's proposed sentence of twelve-months' imprisonment accounts for the fact that defendant is a "zero-point offender" and the reduced guideline range that would apply if USSG § 4C1.1 were in effect.[1]

Additionally, defendant has been the subject of civil sanctions as well as the criminal ones she now faces.  Wells Fargo clawed back over $65 million in stock options.  Defendant has agreed to settlements with the OCC and the SEC involving collective civil penalties of more than $21 million.  And she is barred, per the terms of her OCC settlement from working again in the banking sector.  (PSR ¶ 36.)  These civil remedies themselves provide some deterrence independent of the criminal penalty in this case and further support the conclusion that a sentence higher than twelve months is not required here.

Defendant's background offers other mitigating factors.  She suffers from some health issues, for example, and has a long history of giving back to her community.  Mitigating factors such as these explain in part why the government agrees an above-guideline sentence is excessive and further confirm that she poses no real risk of recidivism.

---

[1] Barring intervention from Congress, it is the government's understanding that the Sentencing Commission intends to make this two-level reduction retroactive.  Accordingly, to the extent the Court considers the proposed amendment in sentencing defendant, the government requests that it do so explicitly on the record.

13

## V. CONCLUSION

A twelve-month term of imprisonment strikes the correct balance. Such a sentence reflects the seriousness of defendant's conduct, promotes respect for the law, provides just punishment, and affords general deterrence to other executives who might find themselves tempted to skirt the truth. At the same time, it acknowledges that defendant has accepted responsibility for her offense and does not pose a continuing danger to the public. And it does so while avoiding unwarranted sentencing disparities the guidelines were designed to avoid. See Gall v. United States, 552 U.S. 38, 54 (2007).

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to twelve months' imprisonment; one year of supervised release under the terms and conditions the USPO set forth in conditions one and four through eight in its recommendation letter (ECF 31 at 1-2); a fine of $100,000; and a $100 special assessment.

**CERTIFICATE OF SERVICE**

I, Carolyn Small, declare:

That I am a citizen of the United States and a resident of or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of 18; and that I am not a party to the above-titled action.

I further declare that on September 1, 2023, I served a copy of the Government's Sentencing Position for Defendant Carrie L. Tolstedt on the assigned United States Probation Officer, Leslie Crews, by substitute service, through electronic mail at Leslie_Crews@cacp.uscourts.gov.

This certificate of service is executed on September 1, 2023, in Los Angeles, California. I certify under penalty of perjury that the foregoing is true and correct.

*Carolyn Small*
_____
CAROLYN S. SMALL

15